On the Merits.
It is heyond dispute that defendant acquired from Arnaudet, Houssiere, and Latreille one-half of one-fifth interest in their lands in the Jennings Oil Field, and that, at his repeated and urgent solicitation, Brown | finally agreed to buy one-tenth of the interest so acquired, which defendant then seemed to think, and so represented, was one-fifth, instead of one-half of one-fifth. Thus J. Clifford Brown (son of Jas. B. Brown), examined under commission, gives the following testimony:
“I am very familiar with the sale. I was there frequently when this sale was being talked of between Martel and Brown. Martel declared, at each and every meeting, at which I was present, what his interests or rights were in the Jennings Oil Field. Mr. Martel declared that two-fifths of the claim of Houssiere and Latreille were given him to represent them in a lawsuit, and was attorney, in other cases, Jules Clement and others. He then engaged D. Caffrey & Son to help him, giving them one half of the fee that was agreed upon between him and his clients and retaining the other half for himself. Mr. Martel made positive declarations to J, B. Brown, in my presence, that he owned one-fifth of whatever interest his clients had in the Jennings Oil Field, and stated that if J. B. Brown would buy one-tenth of whatever he had, or might have, in the Jennings Oil Field, and that, if he won the suit, he would make J. B. Brown a rich man. He repeated this very frequently, in my presence, going with me to Ivanhoe Plantation, where J. B, Brown resided. All of this was also stated in the presence of J. B. Brown, Martel, and myself. Mr. J. B. Brown, on no occasion, made any offer or inducement to J. Sully Miartel to buy an interest or right to said Jennings Oil Field. All the inducements and offers were made to J. B. Brown by Martel, himself; going out to J. B. Brown’s home, himself, personally, to malee such offers .and inducements. In fact, begged J. B. Brown to buy this interest. * . * -* J. Sully Martel made no reservations whatever at the time of the sale to J. B. Brown. * * * He declared what his proportion of the oil interest was, at the time of the sale to J. B. Brown. He declared it so that there might be no mistake. The proportion of the oil, he said, would be one-fifth of whatever amount his clients would receive.”
J. B. Brown, testifying ore tenus, said: That Martel persuaded him to buy the interest. That he did not seek Martel in the matter. That Martel sent him the act to sign.
“He said he and Mr. Caffrey would have half. Q. Do you mean by that that he and Mr. Caffrey would have half each? A. No; that was between the two of them. (Cross-examination by the defendant, himself.) Q. Mr. Brown, when you say half, do you mean that Caffrey owned half and I owned half? A. No, that you *90 and Gaffrey had half and that your clients had the other half; that is what I understood about it.”
In his answer, defendant makes the following “admission,” which is unintelligible, in the light of the undisputed facts:
“He further admits that he sold to Mr. J. B. Brown an undivided one-twentieth of whatever he had at the time in and to one-fifth interest which he owned in certain lawsuits,” etc.
The instrument evidencing the sale to Brown, drawn up by defendant and sent to Brown for his signature, speaks for itself, and says:
“I, J. Sully Martel, * * * have this day sold one-tenth (Vio) of whatever hope, title or interest which I have, or may have, * * * the aforementioned interest being one-tenth of whatever interest I have, or may have, in the Jennings Oil Field * * * included in sections 47, 46, 41, 38 and 52,” etc.
Defendant nowhere denies that he represented to Brown that his interest was one-fifth, and nowhere asserts that he informed Brown that he had previously sold a portion of his interest as originally acquired. Beyond that, very shortly after the organization of the Houssiere-Latreille Oil Company, he caused to be issued to Brown a certificate for 10,000 shares of the stock of that company (signing the certificate in his capacity as secretary of the company), which amount represented one-tenth of his original share of that stock. In view of the facts thus stated, our conclusion is that the defense that plaintiff acquired only one-tenth of such interest as remained to defendant after deducting what he had sold to Viguerie originated in an afterthought and is wholly unsupported and untenable.
There is no serious attempt to sustain the allegation of the answer that the price paid by Brown was less than one-half of the value of the interest conveyed, and it is not easy, to see how such an attempt, if made, could affect the plaintiff now before the court.
The secretary and manager of the accounting department of the firm of Caffrey & Martel, and of the Houssiere-Latreille Oil, Company, testified, as we have seen, that defendant had drawn out of that firm the amount as represented' in plaintiff’s supplemental petition. He also testified that there appeared on defendant’s account two credit items, and defendant was afforded the opportunity of showing by the witness, or otherwise, as he thought proper ’ (the information being all in his possession), what those items amount to, and what bearing they may or might have in this case. So far as we can understand the situation, the most that can be said of them is that defendant, having drawn out $157,154.20, would be, by reason of said credits, entitled to draw a still further sum, in which, also, plaintiff would be interested to the extent of one-tenth. The secretary gave some further testimony, which we do not clearly understand, in regard to the dividend declared by the Houssiere-Latreille Oil Company, and other testimony, in regard to obligations assumed by defendant and the Caffreys, in bonding oil, which appears to us to be rather vague for the purposes of a suit of this character, in which it is admitted that the defendant is, and has been, for nearly seven years (reckoning from the present time), in possession of the property of another, without special authority and somewhat in the character of a negotiorum gestor, and that he has used, and, so far as we are informed, is using, that property as he pleased and as he pleases. Being now called on to account for it, he ought .to show some definite and controlling reason for not doing so; instead of which, he has resorted to all the dilatory tactics known to postpone the accounting, and we were informed by his counsel, in the oral argument, that he (defendant) was resisting plaintiff’s claim to the utmost of his ability. That there will be no danger of inflicting any injustice on defendant by *92 affirming the judgment appealed from is made evident by the statement which his counsel sent to .plaintiff on the night of February 27th as the basis upon which he proposed to make a settlement; that is to say, upon the basis of plaintiff’s ownership of S per cent, instead of 10 per cent, of defendant’s original interest in the Jennings Oil Field, etc., and of defendant’s right to make certain deductions from the amount to which plaintiff would otherwise be entitled, since, even on that basis, defendant admits that the cash balance due plaintiff exceeds, by several thousands of dollars, the amount for which the judgment appealed from was given. And, if there is any error in the judgment here affirmed, it can be corrected under the reservation of defendant’s right to claim, in his future settlement with plaintiff, such credits as he may be entitled to.
In regard to the 66.666% Shares of stock of the Houssiere-Latreille Oil Company, in which plaintiff claims an interest, it appears that in April, 1903, Houssiere and Latreille (as the owners of the land," the title to which was at issue in the then pending suit of Corkran Oil & Development 'Company v. Arnaudet et al.) and Kenneth Baillio (a stockholder in the Corkran Oil Company), with the view to hedging against the eventual outcome of that suit, made an agreement, to the effect that, if plaintiff should win, Baillio would pay the others $5,000, and, if defendant should win, they would pay him a like amount.
In April, 1904, J. Sully Martel and D. Caffrey & Son, of the first part, and Houssiere and Latreille, of the second part, made an agreement whereby the parties of the first part assumed the obligation of the parties of the second part to Baillio; and also agreed that Houssiere and Latreille should “have the right, or personal use, of all the surface of the 455 acres of land in the Corkran grant now owned by the Houssiere-Latreille Oil Company,” subject to the right of the company to use the surface in all necessary exploitations for oil and minerals; and further agreed that they would “carry on, free of charge, any and all litigation resulting from the leases placed on said property by Messrs. Houssiere and Latreille * * * which are registered by the Houssiere-Latreille Oil Company.”
In consideration whereof, Houssiere and Latreille agreed to pay to said parties of the first part “one-fifth of the capital stock of the Houssiere & Latreille Oil Company,” and authorized the president and secretary to issue the stock, accordingly, which they did; the authority therefor and the issuance having been granted, and made, long after the sale to Brown, and for a different consideration from that for which the original issue of stock to Martel was made. If, however, Martel, at the time of the sale to Brown, owned, as he appears to have owned, a one-tenth interest in the surface rights on the 455 acres of land in question, and if he sold, as he appears to have sold, one-tenth of that interest to Brown, it is clear that he could not have disposed of the interest thus sold for a consideration inuring exclusively to himself, and that he owes an accounting in the matter. The value of the surface rights, as compared with the whole consideration given for the 66.666% shares of stock, is not, however, disclosed by the record, and the claim, with respect to the stock was therefore properly dismissed, as in case of non-suit.
The Alleged Compromise.
■ That which defendant calls a compromise, appears to us to have been merely a proposed agreement, which, if accepted by those whose acceptance of, or acquiescence in, its terms was contemplated, would have become an-agreement to submit to arbitration differences between plaintiff and defendant, to arise in the future, but which, having never been accepted, in accordance with its terms, by two *94 of the parties contemplated, to wit, D. Oaffrey, Jr., and J. Sully Martel, never acquired the status of an agreement, and would not have been enforceable, if it had.
The instrument evidencing said proposition, or pro jet, of agreement, contains the following stipulations, to wit:
“Article 1. Within fifteen days, * * * there shall be a settlement of the affairs of Caffrey & Martel” (a firm which had been composed of D. Caffrey, Sr., D. Caffrey, Jr., and J. Sully Martel, and the interest in which, formerly belonging to D. Caffrey, Sr., was vested in his succession, represented by J. M. Caffrey, though in what capacity he was acting does not appear) “and partition of all the assets,” save the wells thereon and appurtenances thereto, the air and steam plants and other miscellaneous movable property, “which said properties, not partitioned, is owned and held, in indivisión, by the hereinafter named parties, in the following proportions: 50 per cent, to D. Caffrey, Jr., and estate of D. Caffrey, Sr.; 36 per cent to J. Sully Martel; 10 per cent, to Prank C. Viguerie ; and 4 per cent, to Percy Saint, transferee of J. B. Brown.
“Article 2. Within five days after the above settlement and partition, Martel shall make a full settlement with Viguerie and Saint; Viguerie is recognized as entitled to 20 per cent, and Saint to 8 per cent, of whatever may be received by the said J. Sully Martel, under the settlement and partition, as provided in article 1.
“Article 3. The 10,000 shares of stock * * * now in possession of Percy Saint, to be returned to the company and canceled and Martel to deliver to Saint 8,000 shares in its stead, and is to pay to said Percy Saint the accrued dividends which said 8,000 shares of stock have earned, up to date.” Saint being recognized as the owner of 8,000 shares and Viguerie of 20,000 shares (referring, always, to the stock of the Houssiere-Latreille Oil Company).
“Article 4. It is agreed and understood that J. Sully Martel shall pay, at his option, 6 per cent, interest on Prank C. Viguerie and Percy Saint’s pro rata of all such amounts as he may have withdrawn, in cash, in excess of his share, in the firm of Caffrey & Martel, or to pay to Percy Saint $1,500 and Prank C. Viguerie • — —
Article 6. Authorizes either of the parties, should he deem it to be his interest, “to appoint an auditor, to audit the accounts,” the expense to be borne by such party.
“Article 7. It is agreed and distinctly understood that any and all differences that may arise, of any nature or kind, whatsoever, between the parties to this agreement, and, especially, as to what assets, or profits, or business, of the firm of Caffrey & Martel, F. C. "Viguerie and Percy Saint are interested in, * * * shall be referred, at the request of any, or all, parties herein, to amicable compounders, for final determination.” " (Italics by the court).
“Article 8. At the time of the settlement provided for in article 2 a settlement shall be made with P. C. Viguerie and Percy Saint for whatever may have been withdrawn by J. Sully Martel from the funds of Caffrey & Martel, in excess of 36 per cent, interest therein subsequent to the dates of the sales by J. Sully Martel to P. C. Viguerie and J. B. Brown, and, in such settlement, J. Sully Martel shall account to P. G. Viguerie for 20 per cent, and to Percy Saint for 8 per cent, of the securities received by him, with interest paid him thereon, and for the same percentage of the cash, by him received, with interest as stipulated in article 4.”
It is not denied that it was the understanding that the proposed,agreement, when signed by the necessary parties, should take effect from the day of its date, February 4, 1909; and, from the prompt efforts of Martel to obtain the signatures of the Caffreys, taken in connection with his own failure to sign, it would appear, not only that he considered them necessary parties, but that he wanted to be certain of their consent to become parties before committing himself upon the subject. He testifies that his reason for wanting them to sign was that he might be assured of settling the affairs of Caffrey & Martel and, thereby, of being enabled to settle with Saint and Viguerie, according to the proposed agreement; which was natural enough, and indicated pretty clearly what his original expectation was, as also what must have been the original expectation of Saint, since they were, both of them, entirely dependent upon the settlement of the affairs of Caffrey & Martel for the settlement that they were to make; and the settlement of the affairs of Caffrey and Martel could not have been made, or forced, within 15 days, without the consent of the Caffreys. Thus it was that, after Saint and Viguerie had signed the papers, Martel, without signing them, himself, instructed his son-in-law, Block, to get the signatures of the Caffreys, and went with Block to Jennings, where J. M. Caffrey was *96 to be found, as Block thought, to aid in getting the signature of that gentleman, as representing himself and the succession of his father, D. Caffrey, Sr., and on the same day that J. M. Caffrey signed, at Jennings, Martel met Block in New Orleans whither the latter' had gone to get the signature of D. Caffrey, Jr. Martel testifies that he did not go with Block, or meet him, to aid in getting the signatures; but it is conceded that Block was acting under his instructions, and it is immaterial whether he gave his personal assistance or not. D. Caffrey, Jr., declined to sign the proposed agreement, because, as he testifies, he did not consider that he was a party to it and had never understood that he was to sign it; and thereafter Martel held it in his possession, without signing it, from the 6th to the 26th of February, which last-mentioned day was the second day after the expiration of the time within which, under said proposed agreement, he was to have made a full settlement with Saint and Viguerie. The only reason that Martel gives for not signing before is that he was anxious about his son, but that could not have been the case on February 5th, when Viguerie signed, and when Martel and Block carried the papers to Jennings to^ get the signature of J. M. Caffrey, or on February 6th, when J. M. Caffrey signed, and Martel and Block were in Jennings together and rode together on the train from Crowley to Franklin; nor could it have been the case on February 18th, when defendant’s son had improved in condition and urged his' family to go to the Momus ball; nor on February 19th, when his son was able to go out driving; nor on February 20th, when defendant went to the automobile races; nor thereafter, since his son was convalescent. Without going into the question, then, of the value, as against the succession of I). Caffrey, Sr., of the signature of J. M. Caffrey (whose capacity does not appear), to the agreement for the partition of property in which the .succession had an interest and which purports to fix, or declare, the extent of its interest in other property, including valuable oil land, it is obvious that, without the other members of the firm, i. e., D. Caffrey, Jr., and Martel, there could have been no agreement that would bind anybody, for the settlement of the affairs of Caffrey & Martel; and, as D. Caffrey, Jr., never did consent to become a party to such an agreement, and as Martel consented only after the proposed agreement had, by its own prescription, expired,, it is equally obvious that there never was any such agreement, and that the very first condition of the projet, to wit, the settlement of the affairs of Caffrey & Martel, within 15 days, could never have been enforced. It is true that on February 22d there was what purports to be a settlement of those affairs; but it cannot be said to have been effected in the carrying out of the proposed agreement, since it was made on the third day after the expiration of the time therein specified. If it be said that that was immaterial, so long as the settlement between Martel and Saint was made within the time limit, as proposed, the answer is that we cannot be so sure of that. There is a stipulation in the proposed agreement to the effect that the settlement of the affairs of Caffrey & Mantel shall be made within 15 days from the 4th of February, and that the settlement between Martel and Saint shall be made within five days thereafter, and we are bound to presume that the interval of five days was allowed for some reason. As to Martel, it was, no doubt, to enable him to make up his account and prepare the statement upon the basis of which he would predicate his offer of a settlement. But article 4 of the proposed agreement authorizes either of the parties to “appoint an auditor to audit the *98 account,” and article 7 provides for the arbitration of “any and all differences * * * of any nature or kind, whatsoever, * * * ” and, especially, as to what assets, or profits, or business, of the firm of Caffrey & Martel, F. C.' Viguerie and Percy Saint are “interested in,” so that, the five days’ delay, between the ascertainment of the interest of Martel, in the firm of Caffrey & Martel, and the time when he was to make the settlement with Saint, was likely to have been as valuable to Saint as to Martel. Let us say, however, that Saint had no interest in the matter, and that, so long as Martel made an offer to settle with him, within 20 days after the date of the proposed agreement, it was a matter that did not concern him when the affairs of Caffrey & Martel were settled, and we still find no improvement in the situation; for, not only did Martel not make such an offer to Saint,. within the 20 days, but he did not, within that time, make himself a party to the proposed agreement, under which said offer, or, rather, such settlement, was to have been made, not having affixed his signature thereto until the 21st day after the date of the instrument.
The proposition that, when the holder of a claim has tried, for several years, to get some adjustment of it, and has, finally, sold it to another, who has brought suit, a stipulation, in a proposed agreement for compromise, or arbitration, fixing the time within which the claim is to be settled, is not of essence of such proposed agreement, is untenable. Reason and authority, alike, are against it. Civ. Code, arts. 2038, 2047; Barrett v. Hard, 23 La. Ann. 712.
We find nothing in plaintiff’s letter of February 26th, or in the letters subsequently addressed to him by defendant’s counsel, or in their conversations, which in any wise affects the rights which plaintiff here asserts.
Moreover, and finally, our conclusion is that, had the proposed agreement acquired the status of an agreement, it would not have been susceptible of specific enforcement, but would have been dependent for its execution wholly upon the will of the parties, since it would have been,,in effect, an agreement to refer, for final determination, differences, to arise in the future, to arbitrators, to be appointed by the parties, and the courts will not compel persons to appoint arbitrators, nor will they otherwise enforce agreements whereby persons undertake, with regard to matters to arise in the future, to close the doors of the courts against themselves. Mirandona v. Burg, 49 La. Ann. 656, 21 South. 723; Gauche v. Metropolitan Bldg. Co., 125 La. 530, 51 South. 578; State ex rel. Watkins v. Land & Co., 106 La. 621, 31 South. 172, 87 Am. St. Rep. 309; Hamilton v. Home Ins. Co., 137 U. S. 370, 11 Sup. Ct. 133, 34 L. Ed. 708; Cyc. vol. 9, pp. 510, 511; A. & E. Enc. of Law, vol. 2, p. 570.
The judgment appealed from is, accordingly, affirmed.
PROVO STY, J., dissents in part.
NICHOLLS, J., takes no part in this case.